RECEIVED BY MAIL
NOV 2 3 2026
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

26cv4754

# PLAINTIFF'S EXHIBIT 1

**Document Title: MN Unemployment Law Judge Notice of Decision**
**Date: Jan 27, 2026**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Establishes ASD diagnosis & binding finding of no misconduct under oath.

SCANNED
NOV 2 3 2026
U.S. DISTRICT COURT MPLS

MINNESOTA
UNEMPLOYMENT INSURANCE
Document ID: 172404449

172404449

01/27/2026

MARK R GILLITZER
8945 IVY RD UNIT 2
SAINT CLOUD MN 56301-9494

Issue Identification Number: 52464362-2

## NOTICE OF DECISION
## OF THE UNEMPLOYMENT LAW JUDGE

Under Minnesota Statutes 268.105, subdivision 1, the enclosed decision of the Unemployment Law Judge is served on you.

**NOTICE TO THE PARTIES:** The law of the State of Minnesota at Minnesota Statutes 268.105, subdivision 5a, provides that the findings of fact and decision issued are only for unemployment insurance benefit entitlement purposes and do not affect any other legal or contractual matter.

**ALSO MAILED TO:**

SOLA OPTICAL, EMPLOYER



**Department of Employment and Economic Development**
PO Box 4629 | Saint Paul, MN 55101-4629 USA
651-296-3745 | Fax: 651-205-4007 | TTD: Toll Free: 1-866-814-1252 | ui.mn.gov
*An equal opportunity employer and service provider*

MINNESOTA
UNEMPLOYMENT INSURANCE

Document ID: 172404449

In the Matter of:

Mark Gillitzer,

Applicant,

AND

**FINDINGS OF FACT**
**AND DECISION**

CARL ZEISS VISION INC.,

Employer.

---

An evidentiary hearing, under Minnesota Statutes 268.105, subdivision 1, was conducted on Monday, January 26, 2026, as a result of the Applicant 's appeal from a Determination of Ineligibility issued on Thursday, January 8, 2026.

**ISSUE(S)**

Whether the applicant was discharged because of employment misconduct and is ineligible to receive unemployment benefits.

**FINDINGS OF FACT**

The appeal of Mark Gillitzer was heard on January 26, 2026, by telephone conference. The applicant, Gillitzer, participated. The employer, Carl Zeis Vision Inc, did not participate.

Gillitzer worked for Carl Zeis Vision Inc from June 2024, to October 9, 2025, as a maintenance technician. At the end of employment, Gillitzer worked full-time.

Gillitzer has a diagnosed autism spectrum disorder.

On October 9, 2025, during a meeting scheduled to address Gillitzer's requested disability accommodation, Carl Zeis Vision Inc became dissatisfied with Gillitzer's conduct. Gillitzer was not yelling or swearing during the meeting. Gillitzer requested additional assistance with filling out the required paperwork for his disability-related accommodation. Gillitzer repeatedly pointed to a computer screen, in which a manager was present via Teams video, and saying "That ain't



**Department of Employment and Economic Development**
PO Box 4629 | Saint Paul, MN 55101-4629 USA
651-296-3745 | Fax: 651-205-4007 | TTD: Toll Free: 1-866-814-1252 | ui.mn.gov
*An equal opportunity employer and service provider*

a person. That's a TV." Gillitzer had become overwhelmed during the meeting and had mentally shut down. He had asked to leave the meeting due to his inability to communicate but was not approved to do so. His conduct was a consequence of his medical condition.

Also during the meeting on October 9, 2025, Carl Zeis Vision Inc told Gillitzer that he was no longer employed.

On October 9, 2025, Carl Zeis Vision Inc discharged Gillitzer from employment because it was dissatisfied with his conduct during an October 9, 2025, meeting.

## CREDIBILITY

The findings of facts are based on the prehearing submissions and Gillitzer's testimony, which was credible because it was candid, he relied on contemporaneous separation paperwork, he had first-hand knowledge, and it was given under oath.

## REASONS FOR DECISION

Minnesota Statutes, section 268.095, subdivision 4, states that an applicant who was discharged from employment is ineligible for unemployment benefits only if the applicant was discharged because of employment misconduct or aggravated employment misconduct.

Minnesota Statutes, section 268.095, subdivision 6, defines employment misconduct as any intentional, negligent, or indifferent conduct, on the job or off the job, that is a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee.

Minnesota Statutes, section 268.095, subdivision 6, paragraph (b), states that regardless of the above definition, the following is not employment misconduct:
(1) conduct that was a consequence of the applicant's mental illness or impairment.

Minnesota Statutes, section 268.031, subdivision 2, states that any legal conclusion that results in an applicant being ineligible for unemployment benefits must be fully supported by the facts.

Carl Zeis Vision Inc has the right to reasonably expect that Gillitzer comply with reasonable and known policies.


Department of Employment and Economic Development
PO Box 4629 | Saint Paul, MN 55101-4629 USA
651-296-3745 | Fax: 651-205-4007 | TTD: Toll Free: 1-866-814-1252 | ui.mn.gov
An equal opportunity employer and service provider

MINNESOTA
UNEMPLOYMENT INSURANCE

Document ID: 172404449

The totality of the evidence supports that Gillitzer did not engage in any intentional, indifferent, or negligent conduct that was a serious violation of Carl Zeis Vision Inc's reasonable expectations. Even if his conduct from October 9, 2025, was a violation of any policies (the credible evidence supports that it was not), it was a consequence of his diagnosed autism spectrum disorder and not avoidable. Accordingly, Gillitzer's conduct does not amount to employment misconduct.

Carl Zeis Vision Inc discharged Gillitzer because of reasons other than employment misconduct. If all other requirements are met, Gillitzer is eligible for unemployment benefits.

**DECISION**

On October 9, 2025, Mark Gillitzer was discharged from employment with Carl Zeis Vision Inc because of reasons other than employment misconduct. If all other requirements are met, Gillitzer is eligible for unemployment benefits. Under Minnesota Statutes, section 268.047, any unemployment benefits paid to Gillitzer will be used in computing the future unemployment tax rate of Carl Zeis Vision Inc.

This determination results in an overpayment of unemployment benefits in the amount of $0.00. To view your overpayment details, log into your account at ui.mn.gov. The Unemployment Insurance Program will take action to collect the overpaid unemployment benefits.

Dated: Tuesday, January 27, 2026 Unemployment Law Judge

You have 4 pending issue(s) that may affect your eligibility for benefits.

Issue ID:

52611527-1 Reporting Requirements - Late report

52612477-1 Ability/Availability/Actively Seeking - Social Security Disability - able with restrictions

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 Ability/Availability/Actively Seeking - Social Security Disability - able with restrictions

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 Ability/Availability/Actively Seeking - Social Security Disability - able with restrictions

Login to your account at ui.mn.gov to check the status of the other issue(s).

If you have any questions about this decision, you may contact the Unemployment Insurance Program. You must have your Issue Identification Number available when you call.

It is important for you to request benefits according to your assigned schedule during the reconsideration process. If the decision is in your favor, you will be paid for weeks that you have properly requested, provided all the other eligibility requirements are met.



Department of Employment and Economic Development
PO Box 4629 | Saint Paul, MN 55101-4629 USA
651-296-3745 | Fax: 651-205-4007 | TTD: Toll Free: 1-866-814-1252 | ui.mn.gov
*An equal opportunity employer and service provider*

MINNESOTA
UNEMPLOYMENT INSURANCE

Document ID: 172404449

**REQUEST FOR RECONSIDERATION**

If you believe this decision is factually or legally incorrect, you may request the unemployment law judge to reconsider the decision. You may do this by logging in to your account at ui.mn.gov, by fax, or by mail (fax number and address are listed at the bottom of this page). A request for reconsideration must include the issue identification number.

Under Minnesota Statute 268.105, subdivision 2, this decision will be final unless a request for reconsideration is filed with the unemployment law judge on or before Friday, March 13, 2026 .

This decision allows you to be paid unemployment benefits if you are otherwise eligible. CARL ZEISS VISION INC. has the right to request reconsideration within 45 calendar days from the date this decision was mailed.



**Department of Employment and Economic Development**
PO Box 4629 | Saint Paul, MN 55101-4629 USA
651-296-3745 | Fax: 651-205-4007 | TTD: Toll Free: 1-866-814-1252 | ui.mn.gov
*An equal opportunity employer and service provider*

# PLAINTIFF'S EXHIBIT 2

**Document Title: Clinical Psychological Assessment (Stone Arch)**
**Date: Oct 23, 2024**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Establishes ADA/MHRA protected disability status (ASD, Depression, Anxiety).

Stone Arch Psychology and Health Services

Stone Arch Psychology and Health Services
219 SE Main St, Suite 400, Minneapolis, MN, 55414
Tel: 6128862524 Fax: 6128862538 Email: support@stonearchpsych.org

# Chart

**Mark Gillitzer**
Client Number: [redacted]105
Date of Birth: 1993-[redacted]
8945 Ivy Road
St. Cloud, MN, 56301
Tel: +13203390257
Email: GILLITZERsolutions@gmail.com

October 23, 2024 Added by: Dr. Tim Johnson PsyD - EIN #[redacted]2506

## Dr. Susan Gustafson PsyD LP - Supervisor

**Date of Intake**
09/09/2024

**Dates of Testing**
10/04/2024, 10/09/2024

**Reason for Referral**
Mark stated that the last time he attended therapy was in January of this year and he stated that he met with that therapist also in 2018 for a year in duration. Mark stated that his therapist retired and he hasn't met with any other therapists since his therapist retired. Mark stated that he is associated with depression and anxiety diagnoses and he stated that his primary care physician attends to his mental health medication protocol. Mark stated that he is concerned that he experiences symptoms of autism spectrum disorder (ASD). Mark reported having difficulty with maintaining and establishing friendships since childhood. Mark stated that he has difficulty with interpersonal communication and he stated that he has difficulty reading social cues and knowing when to involve himself in conversations. Mark stated that he has difficulty with focusing on tasks and he stated that he will attempt mutliple tasks at a time and eventually finish the tasks but not before he is distracted by other tasks and he stated that this has been problematic since childhood. Mark stated that his mood is down or low five to six days a week and he stated that he experiences more general anxiety two to three days a week. Mark stated that his current medication protocol of Buproprion does not attend to his mental health symptoms. Mark stated that he only communicates with one friend currently and he stated that he currently resides with his parents. Mark reported experiencing insomnia and hypersomnia and he stated that he has lost jobs because of oversleeping. Mark stated that he has a tendency to misplace personal items, forget social obligations and appointments and he has a tendency to forget names.

**Brief History**
Mark grew up in his home in St. Cloud, Minnesota with his mother, father and two older brothers. Mark reported currently residing with his parents and he stated that he is close with his family. Mark reported reaching developmental milestones on time. Mark reported a history of Bipolar Disorder, depression and anxiety within his family. Mark reported that he was diagnosed with oppositional defiant disorder (ODD) at 16 years old and he stated that he had received mood disorder diagnoses while attending high school as well. Mark stated that in first grade he had his first behavioral episode at school and that he would run around in class and he would hide from his teachers. Mark stated that he received average to above average grades in elementary and middle school and he reported being sent to an alternative school in high school and he stated that his grades were above average but he reported that the rigor of the classes was poor and he did not graduate on time and he received his GED at 18 years old. Mark reported that he has attended some college and he attended St. Cloud State, St. Cloud Community College and he has attended school online. Mark stated that the focus of his studies has been in mechanics and engineering. Mark reported suffering a consussion at nine years old while wrestling another student at school and the concussion was medically assessed. Mark denied any current major medical concerns. Mark reported a history with the legal system and he reported multiple felonies from adolescence and one felony from adulthood and he served some jail time for the adult felony. Mark reported his history with the legal system has been mostly substance abuse related. Mark reported suffering emotional abuse and neglect in childhood. Mark reported currently working as a maitenance mechanic for a medical company.

**Mental Status Exam**

On the dates of testing, Mark was alert and oriented. He was casually dressed and groomed. His speech was clear and goal-directed. He gave adequate eye contact, and his thought processes were intact. His thought content was unremarkable for hallucinations or delusions. His affect was appropriate and His mood was good. He denied the presence of suicidal or homicidal ideation, plans, or intentions. Mark appeared to give his best efforts during all of the testing procedures and all of the test results are considered valid.

**Tests Administered**

- ☑ Wechsler Adult Intelligence Scale - Fourth Edition (WAIS–IV) – Age: 16 - 90
- ☑ Behavior Rating Inventory of Executive Function - Adult (BRIEF-A) – Age: 18 - 90
- ☑ Brown Attention Deficit Disorder Scales – Age: 3 - 90
- ☑ Integrated Visual and Auditory Continuous Performance Test (IVA-2 CPT) – Age 6 - 90
- ☑ The Trail Making Test - Adult – Age: 15 - 89
- ☑ The Bender-Gestalt – Age: 3 - 85+
- ☑ Minnesota Multiphasic Personality Inventory (MMPI-3) – Age: 18 - 90
- ☑ The Rorschach – Age: 5 and Older
- ☑ The Hand Test – Age: 5 and Older
- ☑ The Incomplete Sentence Blank – Age: 5 and Older
- ☑ The Projective Drawings – Age: 3 and Older

# TEST RESULTS AND INTERPRETATIONS

**Results of the Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV)**
The Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) is a standard, widely used measure of intelligence. It provides a good estimate of current level of intellectual functioning and is designed to assess multiple activities.

Mark was administered ten subtests of the WAIS-IV from which his composite scores are derived. The Full Scale IQ (FSIQ) is considered the most representative estimate of global intellectual functioning. Mark's general cognitive ability is within the High Average range of intellectual functioning. His overall thinking and reasoning abilities exceed 84% of adults his age (FSIQ = 115).

The Verbal Comprehension Index is designed to measure verbal reasoning and concept formation. Mark's verbal reasoning abilities as measured by the Verbal Comprehension Index are in the Superior range and above 96% of his peers (VCI = 127).

The Perceptual Reasoning Index is designed to measure fluid reasoning in the perceptual domain with tasks that primarily assess nonverbal fluid reasoning and perceptual organization abilities. Mark's nonverbal reasoning abilities as measured by the Perceptual Reasoning Index are in the High Average range and above 84% of his peers (PRI = 115).

The Working Memory Index is designed to measure Mark's ability to sustain attention, concentrate, and exert mental control. Mark's score on the Working Memory Index is in the Average range and better than approximately 55% of his age-mates
(WMI = 102).

The Processing Speed Index is designed to measure Mark's ability in processing simple or routine visual material without making errors. Mark's score on the Processing Speed Index is in the Average range and better than 50% of his peers (PSI = 100).

Results of the Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV) - Score Chart

Composite Score Summary

| Scale | Sum of Scaled Scores | Composite Score | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|
| Verbal Comprehension | 44 | VCI 127 | 96 | 120-132 | Superior |
| Perceptual Reasoning | 38 | PRI 115 | 84 | 108-120 | High Average |
| Working Memory | 21 | WMI 102 | 55 | 95-109 | Average |
| Processing Speed | 20 | PSI 100 | 50 | 92-108 | Average |
| Full Scale | 123 | FSIQ 115 | 84 | 111-119 | High Average |
| General Ability | 82 | GAI 124 | 95 | 118-128 | Superior |

Verbal Comprehension Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | *SEM* |
|---|---|---|---|---|---|
| Similarities | 32 | 14 | 91 | 14 | 1.08 |
| Vocabulary | 51 | 15 | 95 | 15 | 0.79 |
| Information | 21 | 15 | 95 | 15 | 0.9 |

Perceptual Reasoning Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | *SEM* |
|---|---|---|---|---|---|
| Block Design | 61 | 15 | 95 | 15 | 0.9 |
| Matrix Reasoning | 19 | 10 | 50 | 10 | 0.9 |
| Visual Puzzles | 20 | 13 | 84 | 13 | 0.95 |

Working Memory Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | *SEM* |
|---|---|---|---|---|---|
| Digit Span | 23 | 7 | 16 | 7 | 0.73 |
| Arithmetic | 19 | 14 | 91 | 14 | 0.95 |

Processing Speed Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | *SEM* |
|---|---|---|---|---|---|
| Symbol Search | 36 | 11 | 63 | 11 | 1.56 |
| Coding | 69 | 9 | 37 | 9 | 1.2 |

**Results of the Behavior Rating Inventory of Executive Function Adult (BRIEF-A)**

*Self-Report:*

The overall index, the Global Executive Composite (GEC), which is an overarching summary score that incorporates all the BRIEF clinical scales, was significantly elevated (GEC T = 68, %ile = 96). T scores above 65 are considered significantly elevated. The Behavioral Regulation Index (BRI) was not significantly elevated and the Metacognition Index (MI) was

significantly elevated (BRI T = 63, %ile = 90 and MI T = 68, %ile = 96). The MI indexes reflect the rated individual's ability to initiate, plan, organize, self-monitor, and sustain working memory. The BRI captures the rated individual's ability to shift cognitive set and modulate emotion and behavior via appropriate inhibitory control.

Within these summary indicators, Mark reports difficulty in his ability to shift between routine tasks and demands and initiate problem solving activity.

*Informant-Report*:

Mark's father completed the Informant Report of the Behavior Rating Inventory of Executive Function (BRIEF). There are no missing item responses in the protocol. The responses are consistent, and the respondent's ratings of Mark appear more positive in comparison to Mark's self-report. In the context of these validity considerations, ratings of Mark's executive function exhibited in everyday behavior reveal two areas of concern.

The overall index, the Global Executive Composite (*GEC*), which is an overarching summary score that incorporates all of the BRIEF clinical scales, was not significantly elevated (*GEC T* = 62, %ile = 88). T-Scores above 65 are considered significantly elevated. The Behavioral Regulation Index (*BRI*) and the Metacognition Index (*MI*) were not significantly elevated (*BRI* T = 62, %ile = 87; *MI T* = 61, %ile = 85). The Behavioral Regulation Index (BRI) captures the rated individual's ability to shift cognitive set and modulate emotions and behavior via appropriate inhibitory control while the Metacognition Index (MI) reflects the rated individual's ability to initiate, plan, organize, self-monitor, and sustain working memory.

Within these summary indicators, Mark's father reports observing Mark experince significant difficulty in his ability to shift between routine tasks and demands and initiate problem solving activity.

**Results of the Brown Attention Deficit Disorder Scales**

The Brown Scale indicates how much difficulty an individual reported having on a wide variety of cognitive and mood regulation functions that are associated with Attention Deficit/Hyperactivity Disorder (ADHD). Scores above 65 are considered significantly elevated.

*Self-Report*

Mark scored in the clinical range on all five scales which indicates that he is reporting a number of symptoms related to an Attention Deficit Hyperactivity Disorder. The results suggest that Mark struggles with organizing and activating to accomplish tasks, sustaining attention and concentrating, sustaining energy, managing affective interference and utilizing working memory. Sam may struggle with getting out of bed, starting the day, organizing for tasks, excessive daydreaming or distractibility when listening or when doing required reading, recalling learned material, slow processing of information, daytime drowsiness, inadequate task completion, depressed mood, increased sensitivity to criticism, lack of motivation, memorizing information, forgetting intended tasks and losing track of needed items.

**Results of the Integrated Visual and Auditory Continuous Performance Test (IVA-2 CPT)**

The IVA is a computerized test that evaluates mental concentration. It measures auditory and visual attention by administering 500 intermixed auditory and visual stimuli and measuring the responses.

Mark provided a valid response to the visual and auditory tests stimuli. His Response Control Quotient score was 97 and this score fell in the Average range. His Auditory Response Control quotient scale score was 99. This global scale score fell in the Average range. The Visual Response Control quotient scale score for this individual was 96. This global scale score fell in the Average range. His full scale Attention Quotient score was 96 and this score fell in the Average range. His Auditory Attention quotient scale score was 110 and this global scale score fell in the Above Average range. The Visual Attention quotient scale score for this individual was 79. This global scale score was classified as falling in the Mildly to Moderately Impaired range.

**Results of the Trail Making Test - Adult**

The Trail Making Test is designed to measure Mark's ability to concentrate and divide his attention; aspects of his executive functioning skills. Mark was able to complete the first and second part of the assessment with Average results, which indicates his ability to divide his attention is comparable to others his age.

**Results of the Bender-Gestalt**

The Bender-Gestalt is designed to measure an individual's visual construction skills, visual motor skills and organization skills. Mark scored in the High Average range and in the 89.74 percentile when compared to his peers, indicating he is likely to be highly skilled in copying, constructing and organizing figures such as letters and numbers when compared to other adults his age.

**Results of the Minnesota Multiphasic Personality Inventory-3 (MMPI-3)**

Mark completed the Minnesota Multiphasic Personality Inventory (MMPI-3), which is a self-report measure of symptomology. The results of the MMPI need to be interpreted with caution because there was an elevation on a validity scale that suggests Mark exaggerated the severity of his symptoms, possibly as a way to communicate his need for help.

Mark's responses indicate that he is experiencing significant emotional distress. He may feel discouraged and lack self-esteem, he may feel pessimistic about his future, feel overwhelmed with his current life stressors and feel incapable to change his circumstances. He may have a lack of positive emotional engagement in life, he may lack energy, have difficulty taking charge or making decisions and be introverted, passive and withdrawn. He may have a low expectation of having success and feel bored and isolated. He may have difficulty conforming to societal norms, he may have difficulties with the police and legal system and act in an aggressive manner and be seen by others as critical, argumentative, angry and antagonistic, and he may experience problems at work and he may be at an increased risk for substance abuse. He may feel targeted, controlled and victimized by others and be suspicious of others and have difficulty trusting others. He may feel anxious and irritable and ruminate about perceived failures. He may experience intrusive and unwanted thoughts. He may feel insecure and be sensitive to perceived criticism and act in a passive and submissive manner in relationships.

Mark is reporting a history of suicide ideation and he reporting experiencing self-doubt. He is reporting being ineffective in making small, inconsequential decisions and being inefficacious. He is reporting above average levels of stress and excessive worry, including worry about misfortune and finances and a preoccupation with disappointments. He is reporting problematic compulsive behavior and multiple problems related to anxiety, including re-experiencing, general anxiety and panic. He is reporting experiencing behavior restricting fears that may affect his behaviors in and outside the home. He is reporting conflictual family relationships and a lack of support from family members. He is reporting a history of juvenile conduct problems. He is reporting disliking people and being around them and disliking being in large groups pr places where large crowds gather and being shy and being easily embarrassed.

**Results of the Projective Assessments**

Mark appears to be devoting more energy and attention towards attending to his immediate environmental responsibilities and needs than he is engaging interpersonally. Environmentally, Mark appears to be an action-oriented individual, however, despite the energy he is putting towards meeting his immediate environmental responsibilities and needs, it appears that he has needs that are going unmet and there may be times when Mark backs away from and takes a more passive stance towards meeting his immediate environmental responsibilities and needs. Interpersonally, Mark appears to be predominantly a communicative individual who has a mild tendency to work to gain recognition and attention from others, to interact in an affectionate manner and to be directive and assertive with those around him. Mark may be prone to act quickly in most situations and may act impulsively before considering the consequences.

Mark appears to be psychologically withdrawn and he may have some difficulty engaging in his daily activities. Mark is not paying sufficient attention to his social and physical surroundings and to the extent he is paying attention, he is an individual who takes a broad perspective when viewing the environment and he may not be detail oriented and he may miss or overlook important details.

Mark has the ambition and energy to develop long term goals and he may work to achieve the goals to earn the recognition and appreciation from others. Mark appears to have the insight and creativity to develop solutions to problems that he encounters and he may be successful in accomplishing his goals.

Mark may have difficulty organizing his time and prioritizing his tasks and may at waste his energy engaging in unnecessary activities. Mark may lose stamina and not have the energy to achieve important goals. Mark may also have difficulties estimating how long a project or task may take to accomplish and may become frustrated when it takes longer than he anticipated.

Mark is not likely to be emotionally responsive to the environment and he may block out or ignore what is going on around him. Mark appears to have dependency needs and he may look to others for nurturing and support. Mark appears to experience internalized feelings of anger and frustration that he is working to conceal. Mark also appears to have internalized feelings of anxiety and unease and he may avoid expressing emotion, especially emotions that are considered socially inappropriate because he worries about an unfavorable response from others. Mark may appear guarded at times and he may have difficulty trusting others. Mark may have a tendency to experience somatic symptoms, such as headaches, stomach aches and body pain as the result of bottling up and having difficulty processing his feelings.

Mark may misinterpret and misperceive the actions and intentions of others in situations he encounters. Mark's lack of clarity may stem from drawing conclusions before gathering sufficient information and from making decisions through the lens of his more anxious state.

**Results of the Autism Diagnostic Observation Schedule (ADOS-2), Module Four**

The Autism Diagnostic Observation Schedule, Second Edition (ADOS-2) is a semi-structured and standardized assessment of communication and social interaction for individuals who have been referred because of possible autism spectrum disorders. The ADOS-2 includes developmentally appropriate opportunities for informal interaction with examiner, examiner-structured situations, and performance-based tasks that have specific directions. Based on the presence/absence and quality of the individual's observed behaviors during the ADOS-2, ratings are assigned and scores are calculated. These are used to help determine the quality of functioning in three developmental areas related to autism spectrum disorders: Communication, Reciprocal Social Interaction, and a third area which encompasses various behaviors including imagination and stereotyped behaviors and restricted interests.

In the area of Communication, the cut-off for demonstrating traits of an autism spectrum disorder is a score of 2 and Mark obtained a score of 6. He used stereotyped words and his conversations skills were moderately impaired. There was little reciprocal conversation sustained by Mark and he tended to follow his own or the examiner's train of thought and he appeared anxious to express himself fully and often his comments were abbreviated and short. He showed a bit of spontaneous offering of information or comments. Mark showed less than an expected spontaneous offering of conventional and instrumental gestures, and rare use of spontaneous or descriptive gestures. However, Mark's gestures appeared appropriate with integration and style. Mark's speech was somewhat flat unless discussing topics of particular interest to him. Mark did not ask for information freely and when opportunities were presented for him to ask for information or make a comment, he would often comment in short answers unless given further direct questions from the examiner.

In the area of Reciprocal Social Interactions, the cut-off for demonstrating traits of an autism spectrum disorder is 5 and Mark obtained a score of 12. Mark's eye contact tended to be fleeting and other times he held a gaze for a long time. He also directed a few facial expressions, even though this was less than would be expected. Coordinating verbalizations with gaze, expressions, and gestures appeared somewhat awkward or forced for Mark but appeared much more comfortable when he was discussing subjects of interest to him. He was able to communicate some understanding, labeling, or response to an emotion in others, but also seemed less than would be expected. He was able to provide several examples of being responsible for his own actions. In addition, Mark presented with an unusual quality of some social overtures and these overtures tended to be restricted to Mark's personal interests and experiences. Mark showed some reciprocal social interaction but this was reduced in frequency. He smiled indicating some enjoyment, but not a lot of pleasure was shown in regards to interactions. Overall, the quality of social overtures, social response, reciprocal social communication, and rapport was reduced and observed as anxious for Mark. In combining the communication and social interaction scores, the cut-off for an autism spectrum disorder is a score of 7 and Mark obtained a score of 18, falling within the autism range.

# CONCLUSIONS

### DISCLAIMER

*Results of psychological testing should always be regarded with caution. Situational and environmental factors may influence an individual's responses and performance, and items may produce findings that reflect current variables more accurately then enduring traits. Because of limitations of scientific and psychological methodology; intervening variables; and human factors, such as adaptability and capacity for change over time; it is impossible to make absolute predictions about future behaviors, abilities or prognoses. Moreover, since individuals may change over time, the results of this testing should not be considered valid into the indefinite future, especially beyond one year without reference to other sources of information.*

### Diagnostic Impressions

Based on the background information and testing data, it appears that Mark meets the criteria for Major Depressive Disorder, Recurrent, Moderate, Social Anxiety Disorder, Generalized Anxiety Disorder, Autism Spectrum Disorder (ASD), Requiring Support and Attention Deficit/Hyperactivity Disorder (AD/HD), Predominantly Inattentive Type. Mark's intellectual abilities show strengths in verbal comprehension and perceptual reasoning and the difference in scores between the verbal comprehension and perceptual reasoning indexes and the processing speed index shows that a true inattention is present. The results of the BRIEF-A Self-Report show that Mark is reporting problems with the following executive functioning concerns: shifting between routine tasks and demands and initiating problem solving activity. The results of the BRIEF-A Informant-Report show that Mark's father is reporting observing Mark experience difficulty with the following executive functioning abilities: shifting between routine tasks and demands and initiating problem solving activity. The results of the Brown ADD Self-Report form show that Mark is reporting difficulties associated with AD/HD, including organizing and activating to accomplish tasks, sustaining attention and concentrating, sustaining energy, managing affective interference, utilizing working memory, struggling with getting out of bed, starting the day, organizing for tasks, excessive daydreaming or distractibility when listening or when doing required reading, recalling learned material, slow processing of information, daytime drowsiness, inadequate task completion, depressed mood, increased sensitivity to criticism, lack of motivation, memorizing information, forgetting intended tasks and losing track of needed items. The results

of the IVA-2CPT show that Mark's Response Control Quotient score fell in the Average range. His Auditory Response Control quotient scale score fell in the Average range. The Visual Response Control quotient scale score fell in the Average range. His full scale Attention Quotient score fell in the Average range. His Auditory Attention quotient scale score fell in the Above Average range. The Visual Attention quotient scale score for this individual was classified as falling in the Mildly to Moderately Impaired range. The results of the Bender-Gestalt showed Mark as scoring in the High Average range, indicating he is likely to be skilled in copying, constructing and organizing figures such as letters and numbers when compared to other adults their age. The results of the Trail Making Test indicated that Mark's ability to divide his attention is in the Average range and comparable to others his age. Mark endorsed responses on the MMPI-3 that indicated he is experiencing significant emotional distress. He may feel discouraged and lack self-esteem, he may feel pessimistic about his future, feel overwhelmed with his current life stressors and feel incapable to change his circumstances. He may have a lack of positive emotional engagement in life, he may lack energy, have difficulty taking charge or making decisions and be introverted, passive and withdrawn. He may have a low expectation of having success and feel bored and isolated. He may have difficulty conforming to societal norms, he may have difficulties with the police and legal system and act in an aggressive manner and be seen by others as critical, argumentative, angry and antagonistic, and he may experience problems at work and he may be at an increased risk for substance abuse. He may feel targeted, controlled and victimized by others and be suspicious of others and have difficulty trusting others. He may feel anxious and irritable and ruminate about perceived failures. He may experience intrusive and unwanted thoughts. He may feel insecure and be sensitive to perceived criticism and act in a passive and submissive manner in relationships. Mark is reporting a history of suicide ideation and he reporting experiencing self-doubt. He is reporting being ineffective in making small, inconsequential decisions and being inefficacious. He is reporting above average levels of stress and excessive worry, including worry about misfortune and finances and a preoccupation with disappointments. He is reporting problematic compulsive behavior and multiple problems related to anxiety, including re-experiencing, general anxiety and panic. He is reporting experiencing behavior restricting fears that may affect his behaviors in and outside the home. He is reporting conflictual family relationships and a lack of support from family members. He is reporting a history of juvenile conduct problems. He is reporting disliking people and being around them and disliking being in large groups pr places where large crowds gather and being shy and being easily embarrassed. The results of the projective assessments indicate that Mark appears to be devoting more energy and attention towards attending to his immediate environmental responsibilities and needs than he is engaging interpersonally. Environmentally, Mark appears to be an action-oriented individual, however, despite the energy he is putting towards meeting his immediate environmental responsibilities and needs, it appears that he has needs that are going unmet and there may be times when Mark backs away from and takes a more passive stance towards meeting his immediate environmental responsibilities and needs. Interpersonally, Mark appears to be predominantly a communicative individual who has a mild tendency to work to gain recognition and attention from others, to interact in an affectionate manner and to be directive and assertive with those around him. Mark may be prone to act quickly in most situations and may act impulsively before considering the consequences. Mark appears to be psychologically withdrawn and he may have some difficulty engaging in his daily activities. Mark is not paying sufficient attention to his social and physical surroundings and to the extent he is paying attention, he is an individual who takes a broad perspective when viewing the environment and he may not be detail oriented and he may miss or overlook important details. Mark has the ambition and energy to develop long term goals and he may work to achieve the goals to earn the recognition and appreciation from others. Mark appears to have the insight and creativity to develop solutions to problems that he encounters and he may be successful in accomplishing his goals. Mark may have difficulty organizing his time and prioritizing his tasks and may at waste his energy engaging in unnecessary activities. Mark may lose stamina and not have the energy to achieve important goals. Mark may also have difficulties estimating how long a project or task may take to accomplish and may become frustrated when it takes longer than he anticipated. Mark is not likely to be emotionally responsive to the environment and he may block out or ignore what is going on around him. Mark appears to have dependency needs and he may look to others for nurturing and support. Mark appears to experience internalized feelings of anger and frustration that he is working to conceal. Mark also appears to have internalized feelings of anxiety and unease and he may avoid expressing emotion, especially emotions that are considered socially inappropriate because he worries about an unfavorable response from others. Mark may appear guarded at times and he may have difficulty trusting others. Mark may have a tendency to experience somatic symptoms, such as headaches, stomach aches and body pain as the result of bottling up and having difficulty processing his feelings. Mark may misinterpret and misperceive the actions and intentions of others in situations he encounters. Mark's lack of clarity may stem from drawing conclusions before gathering sufficient information and from making decisions through the lens of his more anxious state. The results of the ADOS-2 show that in the area of Communication, the cut-off for demonstrating traits of an autism spectrum disorder is a score of 2 and Mark obtained a score of 6. In the area of Reciprocal Social Interactions, the cut-off for demonstrating traits of an autism spectrum disorder is 5 and Mark obtained a score of 12. Overall, the quality of social overtures, social response, reciprocal social communication, and rapport was reduced and observed as anxious for Mark. In combining the communication and social interaction scores, the cut-off for an autism spectrum disorder is a score of 7 and Mark obtained a score of 18, falling within the autism range.

F33.1 Major Depressive Disorder, Recurrent, Moderate
F40.10 Social Anxiety Disorder
F41.1 Generalized Anxiety Disorder
F84.0 Autism Spectrum Disorder (ASD), Requiring Support
F90.0 Attention Deficit/Hyperactivity Disorder (AD/HD), Predominantly Inattentive Type.

**Recommendations**

In light of background information and current test data, it is recommended that:

1. Mark would benefit from individual psychotherapy in order to address psychological and behavioral problems and concerns.

2. Mark would benefit from individual psychotherapy to help him to identify the current stressors in his life and assist him in developing coping skills and building support to manage the stresses.

3. Mark would benefit from individual psychotherapy in order to reduce symptoms of anxiety; worrying excessively, difficulty sleeping and feeling at peace.

4. Mark would benefit from individual psychotherapy in order reduce symptoms of depression; feeling sad, frustrated and irritated.

5. Mark would benefit from a medication evaluation and medication management with a medical professional.

6. Mark would benefit from making checklists and to do lists, adding time estimates and levels of prioritization for each task. Program cell phone, computer or watch alarm as appointment reminders or to keep track of time. Explore the best use of calendars, organizers, computers or personal digital assistants.

7. Mark would benefit from utilizing resources provided by the Autism Society of Minnesota, https://ausm.org/

**Intern Signature**

Timothy Johnson, PsyD

**Dr. Susan Gustafson PsyD LP - Supervisor**

Signature not provided

**Signed By**

Dr. Tim Johnson PsyD
EIN #[redacted]-[redacted]2506
Monday November 18, 2024 at 12:09pm

# PLAINTIFF'S EXHIBIT 3

**Document Title: Official ZEISS Workday Disability Registry Profile**
**Date: June 24, 2024**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Defeats 'lack of notice' defense via system screenshot on hire date.

11:21 5G

Citizenship Status *
Citizen (United States of America)

Nationality

Primary Nationality
United States of America

Additional Nationalities
—

Disability

Disability *
Verbal Expression (United States of America)

Disability Status Date
06/24/2024

Date Known
06/01/2018

Disability End Date
01/01/2099

Military Service

—

**Submission Comments**

Save for Later Submit

# PLAINTIFF'S EXHIBIT 4

**Document Title: Written Disability Disclosure Email to HR (Julie Kerr)**
**Date: March 18, 2025**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Proves written notice of ASD communication limits 6 months prior to termination.

Gillitzer, Mark

To: Kerr, Julie

Reply | Reply all | Forward

Tue 3/18/2025 11:19 AM

Hey Julie,

I am looking to request some accommodations for the extraordinary difficulties that I have been going through here at work. This is the first time I am every doing anything like this, so I have no idea what the steps involved are or even the real desired outcome of this. I just know I have been having some extreme difficulties, and I know I can request accommodations for these. If we could set up some quick meetings as the days go by to discuss the difficulties I am having and how we might better address things moving forward, I think that might be the best first steps, but I am open to your guidance through this. I am not sure how much you know about me, but i have Autism Spectrum Disorder. One of the biggest obstacles in advocating for myself is that my communication breaks down when i get overwhelmed.

Best regards,

Mark Gillitzer
Carl Zeiss Vision Inc.
US Rx - SC
4605 Rusan St
St Cloud, MN 56303
Mark.gillitzer@zeiss.com
www.zeiss.com/us/vision



# PLAINTIFF'S EXHIBIT 5

**Document Title: The Hartford ADA Packet & PWFA Exemption Page**
**Date: Oct 6, 2025**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Exposes accommodation double standard (PWFA internal vs. ADA 3rd-party).

THE HARTFORD
**PO Box 14869**
**Lexington, KY 40512**

Phone: 888-301-5615
Fax: 833-357-5153

October 6, 2025

MARK GILLITZER
8945 IVY RD
SAINT CLOUD MN - 56301

Dear Mark,

We received a request for an accommodation under the Americans with Disabilities Act (ADA). Your claim number is [redacted]7462.

**Get a Decision Faster**
Please complete and return the enclosed **Accommodation Request** form by 10/27/2025.

- There's a section for you to fill out, and one for your healthcare provider to complete.
- Give your provider a copy of your job description to help them complete the form.
- Make sure your provider signs the form before returning it.

There are three ways to return the information we need:

- **Online** at https://abilityadvantage.thehartford.com
- **By fax** to 833-357-5153
- **By mail** to:

**The Hartford**
**PO Box 14869**
**Lexington, KY, 40512**

Your employer makes the final decision on whether to approve your accommodation. Once we have the fully completed Accommodation Request form, we'll send it to your employer. They'll then review and make their decision.

Seeking accommodation because of pregnancy, childbirth, or a related medical condition? Don't fill out ADA paperwork or file an ADA claim. Your employer, not The Hartford, is handling all accommodation requests related to pregnancy. Please contact them for more information on your options and next steps.

Thank you,

The Hartford

The Hartford Insurance Group, Inc. (NYSE: HIG) operates through its subsidiaries, including underwriting companies Hartford Life and Accident Insurance Company and Hartford Fire Insurance Company, under the brand name, The Hartford®, and is headquartered at One Hartford Plaza, Hartford, CT 06155. For additional details, please read The Hartford's legal notice at www.TheHartford.com. The Hartford is the administrator for certain group benefits business written by Aetna Life Insurance Company and Talcott Resolution Life Insurance Company (formerly known as Hartford Life Insurance Company). The Hartford also provides administrative and claim services for employer leave of absence programs and self-funded disability benefi plans. ©2025 The Hartford

Enclosure:

ADA Medical Assessment Form
Pregnant Workers Fairness Act

Leave Claim # [redacted]7462

THE HARTFORD

# ADA Medical Assessment Form

Forms can be mailed to: Hartford Leave Management
PO Box 14869
Lexington, KY 40512

Or faxed to: Toll Free Fax: 833-357-5153

This form must be returned no later than: 10/27/2025

| | |
|---|---|
| Employee's Name: | Last 4 digits of Social Security Number: |
| Claim ID: | Date of Birth: |
| Employer's Name: | |
| Today's Date: | |

The above employee has requested a reasonable accommodation under the Americans with Disabilities Act ("ADA"). The Hartford has been engaged by the Employer to obtain the information requested on this form to assist Employer in evaluating the employee's reasonable accommodation request.

**INSTRUCTIONS**: The following form must be completed in detail and signed by the employee's medical provider. Please attach additional pages or records as needed. **Do not provide information not related to the employee's ability to perform his/her job duties. Example: Do not identify an impairment if it does not have an impact on employee's ability to perform his/her job duties.**

**IMPORTANT NOTICE REGARDING GINA**

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic Information" as defined by GINA, includes the manifestation of disease or disorder in family members of the individual, an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services and genetic information of a fetus carried by an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

The Hartford Financial Services Group, Inc., (NYSE: HIG) operates through its subsidiaries, including underwriting companies Hartford Life and Accident Insurance Company and Hartford Fire Insurance Company, under the brand name, The Hartford®, and is headquartered at One Hartford Plaza, Hartford, CT 06155. For additional details, please read The Hartford's legal notice at www.thehartford.com. The Hartford is the administrator for certain group benefits business written by Aetna Life Insurance Company and Talcott Resolution Life Insurance Company (formerly known as Hartford Life Insurance Company). The Hartford also provides administrative and claim services for employer leave of absence programs and self-funded disability benefit plans.

1. Please confirm you have examined the employee and are familiar with the employee's medical history. ☐ Yes ☐ No

2. Please confirm you have reviewed the job description or equivalent for the employee.
   ☐ Yes ☐ No

3. Type of accommodation?
   ☐ Leave of Absence
   ☐ Workplace Accomodation (Not Leave of Absence)

**Note:** Reasonable accommodations are any changes in the employee's terms or conditions of employment, or in the way in which the employee's job is ordinarily performed, that enables the employee to perform the essential functions of employee's position. Reasonable accommodations may include, but are not limited to a modified work schedule, provision of special equipment, workplace accessibility modifications, shifting of non-essential duties of the employee's position, and extended leave of absence to allow time for recovery, therapy, training, or other disability related needs

4. ***Existence of impairment.*** (Do NOT COMPLETE this question if the employee works in the State of California. Please skip ahead to question 8)
   Is the employee's work restrictions or need for reasonable accommodation because of a physical or mental impairment(s)?
   ☐ No
   ☐ Yes Please list impairment(s):

---

Note. A physical or mental impairment under the ADA is:

- Any physiological disorder, condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine; or
- Any mental or psychological disorder, such as an intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
- The disorder or condition is considered:
  - In its active state, even if presently in remission. (Examples: epilepsy, MS, asthma, cancer, bipolar disorder.)
  - Without regard to the effects of mitigating measures such as prostheses, medication, etc., except ordinary eyeglasses.
  - With consideration of the negative effects of treatment such as medication or other measures.

5. ***Limitations on major life activities.*** If the answer to #4 is yes, does the employee's impairment substantially limit one or more major life activities? Yes No

**Note:** Whether an impairment substantially limits the ability of an individual to perform a major life activity is determined:

- As compared to most people in the general population, and
- Does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity – the impairment only needs to "substantially limit" the employee's ability to perform the major life activity.

6. ***Limitations on major life activities (cont.)***. If the answer to #5 is yes, which major life activity(s) is/are affected? Check all major life activities that both (a) are affected by the employee's impairment(s) and (b) restrict or limit the employee's ability to perform the employee's job duties.

**Major life activities – general life activities:**

- ☐ Bending
- ☐ Breathing
- ☐ Caring for self
- ☐ Concentrating
- ☐ Eating
- ☐ Hearing
- ☐ Interacting with others
- ☐ Learning
- ☐ Lifting
- ☐ Performing manual tasks
- ☐ Reading
- ☐ Reaching
- ☐ Seeing
- ☐ Sitting
- ☐ Sleeping
- ☐ Speaking
- ☐ Standing
- ☐ Thinking
- ☐ Walking
- ☐ Working
- ☐ Other(s) (describe)

______________________________

______________________________

**Major life activities – operation of major bodily functions:**

- ☐ Bladder
- ☐ Bowels
- ☐ Brain
- ☐ Cardiovascular
- ☐ Circulatory
- ☐ Digestive
- ☐ Endocrine
- ☐ Genitourinary
- ☐ Hemic
- ☐ Immune
- ☐ Lymphatic
- ☐ Musculoskeletal
- ☐ Neurological
- ☐ Normal cell growth
- ☐ Operation of an organ
- ☐ Reproductive
- ☐ Respiratory
- ☐ Sensory organs & skin
- ☐ Other(s) (describe)

______________________________

______________________________

7. ***Commencement of impairment(s).*** For the impairments identified above, when did the employee's impairment(s) commence? If there is more than one impairment, please specify the start date for each:

______________________________

______________________________

______________________________

8. ***Performance of essential job functions.*** Does the employee's impairment(s) limit his/her ability to perform the essential functions of the employee's position (as defined in the job description) without any accommodation? ☐ Yes ☐ No

If the answer is yes, please:

a. Identify which essential function(s) the employee is unable to perform without an accommodation:

______________________________

______________________________

______________________________

6. ***Limitations on major life activities (cont.).*** If the answer to #5 is yes, which major life activity(s) is/are affected? Check all major life activities that both (a) are affected by the employee's impairment(s) and (b) restrict or limit the employee's ability to perform the employee's job duties.

Major life activities – general life activities:

- ☐ Bending
- ☐ Breathing
- ☐ Caring for self
- ☐ Concentrating
- ☐ Eating
- ☐ Hearing
- ☐ Interacting with others
- ☐ Learning
- ☐ Lifting
- ☐ Performing manual tasks
- ☐ Reading
- ☐ Reaching
- ☐ Seeing
- ☐ Sitting
- ☐ Sleeping
- ☐ Speaking
- ☐ Standing
- ☐ Thinking
- ☐ Walking
- ☐ Working
- ☐ Other(s) (describe)

Major life activities – operation of major bodily functions:

- ☐ Bladder
- ☐ Bowels
- ☐ Brain
- ☐ Cardiovascular
- ☐ Circulatory
- ☐ Digestive
- ☐ Endocrine
- ☐ Genitourinary
- ☐ Hemic
- ☐ Immune
- ☐ Lymphatic
- ☐ Musculoskeletal
- ☐ Neurological
- ☐ Normal cell growth
- ☐ Operation of an organ
- ☐ Reproductive
- ☐ Respiratory
- ☐ Sensory organs & skin
- ☐ Other(s) (describe)

7. ***Commencement of impairment(s).*** For the impairments identified above, when did the employee's impairment(s) commence? If there is more than one impairment, please specify the start date for each:

8. ***Performance of essential job functions.*** Does the employee's impairment(s) limit his/her ability to perform the essential functions of the employee's position (as defined in the job description) without any accommodation? ☐Yes ☐No

If the answer is yes, please:

a. Identify which essential function(s) the employee is unable to perform without an accommodation:

b. Describe the manner in which the employee's ability to perform each essential function is limited:

______________________________________________

______________________________________________

______________________________________________

**Leave as an Accommodation**

9. If the employee is specifically requesting a leave of absence as an accommodation

a. Will a leave of absence assist the employee to return to work? ☐ Yes ☐ No

b. How will leave assist the employee in returning to work?

______________________________________________

______________________________________________

______________________________________________

c. Please check the box that best describes the amount of time you expect the employee to be absent from work.

☐ **Indefinite** - No return to work date can be determined at this time.

☐ **Definite** - Please include date on which employee is realistically expected to return to work (not date of next appt with healthcare provider)

Return to Work date: ______________

d. *Duration*. What are the dates, type of leave, and if applicable, the frequency and duration, you anticipate the employee will need for the leave of absence?

Continuous leave starting on ________ through ________

Reduced schedule leave starting on ________ through ________ with an anticipated schedule of: ____ hour(s) per day: ____ days per week

Intermittent leave starting on ________ through ________ with an anticipated frequency and duration of absences for (e.g. 1 episode every 3 months lasting 1-2 days):

Please estimate the absences needed for flare-ups of condition:

Frequency: ____ times per ____ week(s) ____ months(s)

Duration: ____ hours or ____ days(s) per episode

Please estimate the absences needed for office visits for condition:

Frequency: ____ times per ____ week(s) ____ months(s)

Duration: ____ hours or ____ days(s) per episode

**Note:** Please provide your best medical judgment, based on current information, as to the length of time the employee will need an accommodation to perform his/her essential job functions.

## Workplace Accommodation (Not Leave of Absence)

10. Will an accommodations(s) enable the employee to perform the essential job functions?

☐ Yes ☐ No

If so please describe:

a. How will the accommodation(s) assist the employee in performing the essential job functions.

b. Duration. For how long do you anticipate the employee will need the identified accommodation(s) to perform the essential job functions?

(check one) ☐ days ☐ weeks ☐ months ☐ years or ☐ permanent

**Note:** Please provide your best medical judgment, based on current information, as to the length of time the employee will need an accommodation to perform his/her essential job functions.

Comments:

11. ***Additional information.*** Are you aware of any other information that should be considered in assessing whether the employee can perform the essential job functions with or without accommodation. ☐ Yes ☐ No

If yes, please describe:

12. COVID-19 Vaccine Exemption (Please complete if employee is requesting to be excused from the employer's COVID-19 Vaccination requirements due to a medical condition or contraindication)

a. Please confirm if you have recommended the employee not receive the COVID-19 vaccine due to their medical condition? ☐ Yes ☐ No

If yes, do you anticipate the employee's medical condition will improve so they will be able to receive the COVID-19 vaccine at a later date? ☐ Yes ☐ No

If Yes, approximately what date? ____________

b. Does the employee's medical condition preclude them from regular COVID-19 procedures below:

Testing: ☐ Yes ☐ No Wearing face coverings: ☐ Yes ☐ No

Provider Name (print): ______________________________

Provider Signature: ______________________________

Provider Practice/Specialty: ______________________________

Provider Phone Number: (____) ______________________________

Provider Address: ______________________________

Date: ______________________________

Leave Claim # [redacted]7462

## INFORMATION ON ACCOMMODATION REQUESTS FOR PREGNANCY, CHILDBIRTH & RELATED MEDICAL CONDITIONS

This notice is to provide some information about work accommodations for pregnancy, childbirth, and related medical conditions under federal laws such as the Pregnant Worker's Fairness Act (PWFA) and the Americans with Disabilities Act (ADA). If your accommodations request does not apply to pregnancy, childbirth, or related medical conditions, you do not need to review this information.

**If you are pregnant or plan to become pregnant, you may be seeking an accommodation due to your pregnancy, childbirth, or a related medical condition.** If you need an accommodation related to these conditions, including common accommodations such as the need for extra breaks, to carry/keep water at hand, to sit or stand as may be necessary, etc., immediately contact your employer. Your employer will provide guidance on next steps in the accommodations process.

---

**What is the PWFA?**
The PWFA, which went into effect on June 27, 2023, requires employers with at least 15 employees and other covered entities to provide reasonable accommodations to a qualified employee's or applicant's known limitations related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions, unless the accommodation will cause undue hardship on the operation of the employer's business.

**What types of conditions are covered under the PWFA?**
Of course, actual pregnancy is covered. But the law goes beyond that and includes situations such as trying to get pregnant (e.g., *in vitro* fertilization), termination of pregnancy (including contraception, miscarriage, stillbirth, and abortion), childbirth and the postpartum period, and lactation. Any physical or mental condition with *any* relationship to pregnancy is likely to be considered a pregnancy-related condition. This can also include medical conditions that may be exacerbated by pregnancy or childbirth.

Unlike accommodations under the ADA, the pregnancy-related condition under the PWFA can be short-term and relatively mild, including morning sickness in the first trimester, swollen ankles, problems with mobility, etc.

**What kinds of accommodations does the PWFA provide?**
The PWFA provides temporary accommodations for a limitation related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions. A limitation is a physical or mental condition that interferes with your job performance. The PWFA is intended to address modest, minor, and/or episodic accommodations to maintain the health of the fetus or employee's health. PWFA accommodations do not need to meet the definition of disability under the ADA. Certain "Predictable Assessments" are recognized as easy for employers to approve. These are:

- Allowing an employee to carry or keep water near to enable them to drink;
- Permitting an employee to take additional restroom breaks as needed;
- Allowing an employee whose work requires standing to sit and whose work requires sitting to stand as needed; and
- Allowing an employee to take breaks to eat and drink as needed.

Other examples of requests that may be reasonable include: schedule changes due to morning sickness or to treat medical issues following delivery; adjustments to accommodate restrictions for lifting or requests for light duty; time and/or space to pump or nurse during work hours; or time off to recover from childbirth.

**How does the PWFA interact with the ADA?**
An ADA eligible condition is a physical or mental impairment that substantially limits one or more major life activities, has a history or record of impairment, or is perceived by others as having such an impairment.
If an employee wants a pregnancy-related accommodation which may qualify as a disability under the ADA, the employer is expected to first follow the law that makes it easier for the employee to get the accommodation. The same is true if a state pregnancy accommodation law also applies, or another federal law.

If your accommodation is associated with your pregnancy, childbirth, or a related medical condition, you can ignore the enclosed ADA paperwork. There is no need for you to take any further action with the enclosed ADA paperwork at this this time.

Instead, you should discuss your request with your employer to provide guidance on next steps in the accommodations process. Pregnancy-related accommodation requests will be managed by your employer, not The Hartford. Please contact your employer for additional details. At this time, you can ignore the ADA paperwork and cancel the ADA claim.

**Might I still be eligible for a pregnancy accommodation under the ADA?**
Yes, your pregnancy-related condition could possibly meet the definition of a disability under the ADA and be covered under that law. However, it is important to contact your employer to provide notice to them that you would like a pregnancy-related accommodation and the employer will take it from there.

# PLAINTIFF'S EXHIBIT 6

**Document Title: Formal Written Discrimination Complaint Email**
**Date: Oct 8, 2025**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Establishes statutorily protected opposition ('can't discriminate for medical condition').

Gmail

Mark Gilli <gillitzersolutions@gmail.com>

## Write up

1 message

**Mark Gilli** <gillitzersolutions@gmail.com> Wed, Oct 8, 2025 at 12:33 PM
To: "Kerr, Julie" <julie.kerr@zeiss.com>

Hey Julie,
I didn't refuse to sign that last write up, I am challenging the nature of the incidents. I have to take medication throughout the day and I have been using my personal breaks to take care of this, I have doing this in good nature to not be a burden to the company, but the fact that I am being punished for doing what I have to, to live, it's time its documented. I am also requesting to see all the video footage. You guys can't discriminate against someone for their medical condition.

# PLAINTIFF'S EXHIBIT 7

**Document Title: ZEISS Notice of Involuntary Termination Email**
**Date: Oct 9, 2025**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Establishes 24-hour retaliatory temporal proximity (Oct 8 complaint -> Oct 9 termination).

Gmail Mark Gilli <gillitzersolutions@gmail.com>

# Exiting ZEISS

3 messages

**Kerr, Julie** <julie.kerr@zeiss.com> Thu, Oct 9, 2025 at 12:39 PM
To: Mark Gilli <gillitzersolutions@gmail.com>

Dear Mark ,

Your employment with Carl Zeiss Vision Inc. was involuntarily terminated effective October 9, 2025, because you violated the Company's Employee Conduct Policy.

If pay is due to you, your final paycheck will be mailed to your home or direct deposited into your account depending on your current payment method. COBRA information (if you currently have insurance with us) will be mailed separately. Your insurance coverage ends at 11:59 p.m. on the day of your termination. You must complete the COBRA information when you receive it to continue coverage. Per Company policy, accrued vacation hours will not be paid out at termination.

If you move within the next 12-18 months, please notify us so that we can continue to send you information like your 2020 W-2, 401(k) information, etc.

Please find enclosed the following information.

1. Employee Confidentially & Invention Agreement – **Please sign one copy and return to Julie Kerr.**
2. COBRA Management Services, LLC Memo
3. 2022 Benefits Conversion Information
4. COBRA Q&A Medical

If you have any questions, please feel free to contact me.

Best Regards,

Julie

____________

**Julie Kerr**

Human Resources Business Partner

ZEISS Vision Care US

Carl Zeiss Vision Inc.

4605 Rusan Street

St. Cloud, MN 56303 USA

Mobile: +1 612-479-5335

julie.kerr@zeiss.com

www.zeiss.com/us/vision

**Access our 24/7 self-service digital platforms :**

https://www.zeiss.com/myzeissbusiness

Need access? Contact our team at zeissidsupport.vision.us@zeiss.com




Carl Zeiss Vision Inc.

Headquarters: Hebron, KY

President: Gary Rosenblum

ZEISS classification: Restricted

**4 attachments**

**11. Employee Confidentiality Invention Agreement 2016.pdf**
77K

**CMS contact sheet for termed employees.pdf**
131K

**2022 Benefits Conversion Info.pdf**
65K

# PLAINTIFF'S EXHIBIT 8

**Document Title: Workday Resignation Attempt Under Duress**
**Date: Oct 9, 2025**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Corroborates hostile work environment ('fear for my safety').

11:17 5G

## Submit Resignation

**Mark Gillitzer**

Proposed Termination Date *

10/09/2025

Reason for Resignation *

Reason for Resignation is required.

Additional Reasons for Resignation

**Submission Comments**

won't let me add reason.
Reason for leaving is fear for my safety

Save for Later

Submit

# PLAINTIFF'S EXHIBIT 9

**Document Title: 2024 Performance Evaluation & Workday Status**
**Date: Sept 30, 2025**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Proves 'Meets Expectations' performance & training blocked by supervisor.

Gillitzer, Mark

ZEISS People Development Dialogue 2024 - Individual Contributor Short Version Global

Technician I, Maintenance

Organization: VISUS-PCTM USRX-SC Maintenance (VISUS) (Aaron Kreiling)

Manager: Aaron Kreiling

Location: USA - MN St. Cloud

Evaluated By: Aaron Kreiling

10/01/2023 - 09/30/2024

# Overall Performance

## Manager Overall Evaluation

Rating: Meets Expectations

Comment: For someone coming into Vison business with little experience with our type of equipment, Mark has done a great job learning. Goals i have for Mark is getting to understand even more about the existing machines and getting him some training from outside sources. Giving Mark the tools he needs to succeed.

# Acknowledgement

## Employee

Entered by: Mark Gillitzer (Terminated) Date: 09/18/2024

Status: I accept and acknowledge, that I have discussed the content of the review with my manager.

Comment:

# Performance

## What did you achieve last year? What went well?

### Manager Evaluation

Response: Mark has been a great addition to the team. Taking the time to learn new things and able to pick up quickly. Willingness to take on new tasks when asked.

### Employee Evaluation

Response: I cant say much to this, as things are a slow daily progression at best, but no real achievements stand out to me. I am thankful to have this job, i am very grateful to have kind people to give me a chance to prove myself.

## What didn't go well? What would you do differently going forward and where do you need to improve?

### Manager Evaluation

Response: At times, Mark seems to have trouble staying on task. Being able to figure out and prioritize what needs to be done and when. This is something that comes with time and experience.

Mark says it, but being able to be at work when expected is critical for the teams to succeed. There are days that attitude comes

### Employee Evaluation

Response: I could have used more definitive expectations as to what I am expected to bring to the table in doing specific tasks. It might be nice moving forward to have more independence in how to best accomplish different tasks. I need to improve in my communication as well as my attendance in regards to being punctual. safety is one thing I would like to improve but at this workplace

into play, but I do think this has also improved.

it is going to come with practice not by practice unfortunately.

What did you do in addition to regular tasks and activities?

Manager Evaluation

Response: Marks willingness to take on things, even if he may not have the most experience, is something we appreciate. This is a great attribute to have but also can get you in a little trouble. Use the knowledge we have surrounding you to help you grow. You should not have to feel like you have to get things done on your own.

Employee Evaluation

Response: learning, going above and beyond to achieve the things I need to learn, in the way I need to learn them, due to my disabilities. showing commitment to teamwork by always being willing and offering to help anyone who may need it. Making it MY commitment to do whatever may be needed, weather asked to or not, to help further the goals of the company and make the lives of myco-workers and MY management easier.

Section Summary

Manager Evaluation

Rating: Meets Expectations

Comment: Mark is doing very well for Team Zeiss and look forward to the growth over the next coming months and years.

Employee Evaluation

Rating: Meets Expectations

Comment:

## Competencies

### Collaborates

Building partnerships and working collaboratively with others to meet shared objectives.

*Examples of behavior for "Collaborates":*

- Shares information with others so there are no surprises.
- Involves others as appropriate to accomplish individual and group goals.
- Encourages unity rather than "us vs. them" thinking.
- Welcomes and acknowledges the ideas and input of others.

Manager Evaluation

Proficiency Rating: Solid

Employee Evaluation

Proficiency Rating: Foundational

### Communicates Effectively

Developing and delivering convincing communications that address the unique needs of different

audiences.

*Examples of behavior for "Communicates Effectively":*

- Clear, concise, and professional in communication.
- Listens with interest to what others have to say.
- Shares information and updates with others as needed.
- Is clear and thorough in reports, documentation, and other written information.

Manager Evaluation
Proficiency Rating: Foundational

Employee Evaluation
Proficiency Rating: Needs Development

## Cultivates Innovation

Creating new and better ways for own work and the organization to be successful – embracing also digital opportunities.

*Examples of behavior for "Cultivates Innovation":*

- Suggests creative ideas and innovative solutions.
- Explores multiple alternatives and approaches to overcome obstacles and find solutions.
- Applies expertise in ways that are unique or innovative.
- Is open to and builds upon new ideas and solutions offered by others.

Manager Evaluation
Proficiency Rating: Strong

Employee Evaluation
Proficiency Rating: Very Strong

## Customer Focus

Delivering customer-centric solutions and building strong internal and external customer relationships.

*Examples of behavior for "Customer Focus":*

- Searches for ways to improve customer service.
- Follows up with customers to ensure problems are solved.
- Independently anticipates and meets customer needs.
- Internalizes customer feedback and provides innovative ideas to meet their future needs.

Manager Evaluation
Proficiency Rating: Strong

Employee Evaluation
Proficiency Rating: Solid

## Ensures Accountability & Results

Demonstrating a strong drive for results and holding self and others accountable to meet commitments.

*Examples of behavior for "Ensures Accountability and Results":*

- Monitors progress of performance and changes approach accordingly.
- Takes ownership of own work.
- Takes responsibility for successes and failures in own work.
- Follows through on commitments.

Manager Evaluation
Proficiency Rating: Solid

Employee Evaluation
Proficiency Rating: Solid

Instills Trust

Gaining the confidence and trust of others through honesty, Integrity, and authenticity.

*Examples of behavior for "Instills Trust":*

- Is honest and straightforward when working with others.
- Honors agreements and commitments, even when working through competing priorities.
- Shows consistency between words and actions.
- Maintains integrity and professional codes of conduct.

Manager Evaluation
Proficiency Rating: Solid

Employee Evaluation
Proficiency Rating: Solid

Section Summary

Manager Evaluation
Proficiency Rating: Solid

Comment: Mark is working hard to gain the skills needed. With a little more coaching and self work, I feel Mark will get where he want to be. Attitude and Communication are the 2 things that we will be working on to help Mark achieve what he is looking for. I have already seen some improvement and I am sure we will get the rest of the way.

Employee Evaluation
Proficiency Rating: Solid

Comment:

## Collected Feedback

Section Summary

Manager Evaluation

Comment: I look forward to see where the next year takes us. Mark is a hard worker and is willing to put in the work and hours to get the job done.

Employee Evaluation

Comment:

## Development & Career

How did you manage your work-life balance this year? How would you like to manage it in the next 12 months?

Manager Evaluation

Response: Mark has done a pretty good job on being here when he can. He also has missed some time, but has given me a heads up for

Employee Evaluation

Response: work life balance this last year has been good! I look forward to taking a vacation eventually!

the most part.

What will you be working on the next 12 months? (tasks, objectives, specific projects etc.)

Manager Evaluation

Response: I agree with Marks assessment and will add that I would like for Mark to better learn to prioritize his day. The hard thing is Maintenance sometimes gets pulled in multi-directions and it gets hard to figure out what needs to be done first. This will come with time.

Employee Evaluation

Response: I will continue to develop relations with my co-workers, working on improving our communication, and gaining more fluency with knowing where I can be of most use and how I can best fit into things.

What development areas are you interested in? Where do you want your career to go?

Manager Evaluation

Response: I would like to see Mark take on some new task that maybe would challenge him more and get him a little excited. Sending Mark off for outside training is also another way I think we can use him to better himself in knowledge of the various equipment we have.

Employee Evaluation

Response: LOGIC,
I want to gain more hands on experience working with the logic that runs our PLC's (which is in every machine we have). Working with TwinCat, different software programs that allow us to see the raw data that is running the machine. Also would like to get an area of specialty (i.e. AR machines. the lasers, ect.) I would also like to take up special projects and travel for different projects.

How can your manager support your development? What do you need from your manager?

Manager Evaluation

Response: Working with Mark to understand expectations is one thing that I feel I may need to work on with him.

Employee Evaluation

Response: provide insight as to the best way to move forward week to week to stay accomplishing my work goals.
continuing his coaching on intrapersonal communication for me. provide me any opportunities that are available to further myself.

Section Summary

Manager Evaluation

Comment: Overall, I am pleased with the progress I see from Mark. There are a few items that we all need to work on and the main one that I see is communication. Mark has the opportunity to talk with both the 3rd shift team and the 2nd shift team and get the information spread. This is something that is very important and hopefully he will continue to work on this.

Employee Evaluation

Comment:

# Development Items (past and future)

## Outside Training

Additional Information: Goal is to get Mark in some training classes outside of shop to learn MEI and possibly other machines.

Status: To be discussed

Relates To: Industrial Mechanic 1

Start Date: Oct 1, 2024 Completion Date: Aug 29, 2025

Section Summary

### Manager Evaluation

Comment: Goal would be to get Mark sent off for some training on equipment over the next year.

### Employee Evaluation

Comment:

# PLAINTIFF'S EXHIBIT 10

**Document Title: Coworker Comparator & Training Fact Sheet**
**Date: Oct 2025**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Demonstrates disparate treatment in specialized equipment training.

**2024 career advancement discrimination facts**

Aaron talked about further training in 2024 performance review but yet I was the only technician that did not go to any training.

Maverick - MEI Chicago
Steve - Refer cert.
Vince - refer cert
Thomas - MEI Chicago
Schmidt - ??

# PLAINTIFF'S EXHIBIT 11

**Document Title: Indeed Job Posting: Technician II, Maintenance**
**Date: Post-Termination**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Establishes promotional blocking & economic harm ($22-$28/hr position).

indeed

Sign in

zeiss group

saint cloud, mn 56304

Search

Pay | Within 35 miles | Job Type | Experience level | Education | Date posted

Upload your resume - Let employers find you

zeiss group jobs in Saint Cloud, MN 56304

Sort by: **relevance** - date

### Technician I, Lab

ZEISS Group
Saint Cloud, MN

$16 - $20 an hour · Full-time · Pet insurance · Health insurance · 401(k) matching · Paid time off · Health savings account · Paid sick time

### Technician II, Lab

ZEISS Group
Saint Cloud, MN

$18.50 - $23.00 an hour · Full-time · Health insurance · Retirement plan · Paid time off

### Technician II, Maintenance

ZEISS Group
Saint Cloud, MN

$22 - $28 an hour · Full-time · Weekends as needed +1 · Health insurance · Retirement plan · Paid time off

Get email updates for the latest **zeiss group** jobs in **saint cloud, mn 56304**

By creating a job alert, you agree to our Terms. You can change your consent settings at any time by unsubscribing or as detailed in our terms.

**Resume Resources:** Resume Samples - Resume Templates

**Career Resources:** Career Explorer - Explore High Paying Jobs

**Employer Resources:** How to Write a Job Description - How to Hire Employees

Hiring Lab

Career advice

Browse jobs

Browse companies

Salaries

Indeed Events

Work at Indeed

Countries

About

Help

ESG at Indeed

© 2026 Indeed

Your Privacy Choices

Accessibility at Indeed

Privacy Center and Ad Choices

Terms

# PLAINTIFF'S EXHIBIT 12

**Document Title: EEOC Notice of Right to Sue & Transcripts**
**Date: Sept 15, 2026**

**EVIDENTIARY PURPOSE FOR THE COURT:**

Proves administrative exhaustion & corroborates meeting audio recordings.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Minneapolis Area Office**
330 South Second Avenue, Suite 720
Minneapolis, MN 55401
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)
Issued On: 09/15/2026

**To:** Mark R. Gillitzer
8945 Ivy Rd
SAINT CLOUD, MN 56301
Charge No: 444-2026-00806
EEOC Representative and email: DIANE SANDSTROM
INVESTIGATOR
DIANE.SANDSTROM@EEOC.GOV

---

### DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 444-2026-00806.

On behalf of the Commission,
Digitally Signed By:Cherie Doak
09/15/2026

Cherie Doak
Director

**Cc:**
Grant D Goerke
Littler Mendelson, P.C.
80 South 8th Street, Suite 1300
Minneapolis, MN 55402

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 444-2026-00806 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 444-2026-00806 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.
- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

Exhibit A: Full Verbatim Transcript of the 10/09/2025 Meeting

**Julie:** So, let's just get started. This is a follow-up to our conversation from yesterday. During that conversation, you requested to meet with leadership, so this is Tina. She's my boss, she's our manager, and you know Dean.

**Dean:** Hi.

**Mark:** Nice to meet you.

**Tina:** I just want to make sure it's clear that Dean is available until about 10:25, so we have a hard stop then. The first thing I want to start with is your complaint. I want to reiterate that we did look into it, and we could not substantiate your claim. Aaron is your supervisor and he must provide feedback; that is part of his job responsibility. You mentioned in our call yesterday that you felt intimidated because of his body language, but you didn't tell me about the body language. Is that something you can show us or tell us today?

**Mark:** Yeah. So, like, he shifts his posture, he starts talking with his hands more... he gets really defensive. It's really that defensiveness that kind of triggers me. Like I said in the prior instance, he got in my face, he was yelling, he was more or less spitting in my face.

**Tina:** And that was about a year ago?

**Mark:** Yeah, that was in back, right... well, Eric witnessed it, but he stepped in instead of you in that situation. It was just pretty wild and out of the norm.

**Tina:** So, do you have any other examples, evidence, or recordings that you could share with us? I'd appreciate it if you'd send them to me if you have them.

**Mark:** I don't know... half this crap, you know, a person would have to be super-duper organized and have the intent of going after somebody to have all this crap organized to the point where I could bring a case against him. I don't do that. The only reason I record my stuff is because of a perfect example: apparently Aaron was saying I was threatening him in that meeting. If I didn't have a recording of that meeting, it would be his substantiated claim, being a supervisor, against mine. If I didn't have a recording of that, I would have been canned instantly. So, it's like I'm being pushed to the point where I have to record conversations just so I don't get pushed out the door when I'm not doing anything wrong. That's a huge concern of mine.

**Tina:** So, then, another thing you talked about yesterday is that you have a disability and you want to walk through the accommodation process. We are more than willing to work with you. I understand you did connect with Mary yesterday?

**Mark:** Yeah, she was incredibly helpful. I've got some follow-up to do on that.

**Tina:** So, we've got that process triggered, but there are some very specific steps that the process needs to take.

**Mark:** Yeah, and I got that started. But the whole stereotype of these companies or processes making it more difficult to see it through and everything... we all kind of understand that.

**Dean:** Well, it's just, I mean, there's a very specific process and steps that have to be taken in a specific order.

**Mark:** Right. I understand that.

**Tina:** I encourage you to please continue to work with The Hartford and Mary, because they're the experts in that.

**Mark:** But just on that note, I did inquire about this and bringing my disability to your attention previously. I believe it was after that first verbal... I think it was prior to that. I think it was actually

after me and Aaron had that little budding of heads in the back that I just explained earlier. That's when you referred me to Mary and Denise. I was in contact with them six months prior. I was trying to start this whole process of making it known that I have a disability. I don't need anything extraordinary, I just kind of want to stop being picked on for my performance, because as far as I know, my performance is decent—it's great.

**Tina:** Well, with that, like I said, there's a process and you have a responsibility in that to follow through.

**Dean:** So, what was the disconnect?

**Mark:** So, they left it on me to call The Hartford at the time. I looked up the website, got the number, and reading their information, it really didn't say that they dealt with anything regarding accommodations or disabilities. It seemed like if I needed to start a life insurance or a monetary plan. That's where I just kind of gave up. But I mean, that technically falls on me.

**Dean:** Did they provide you with a contact number?

**Mark:** Maybe they sent an email, but the page I was looking at... even right now, even when I filed my claims, it's like I'm filling out an insurance question... like, "What's the start date of my leave?" It's like, I'm not requesting leave! But technically the start date of my leave was October 6th, the day that I'm requesting accommodation for. I'm paired up against a system that's not designed to handle my request.

**Dean:** But Mary or Denise would be the people available to contact to say, "Hey, I logged on, I saw this, it's confusing to me. How do I move this forward?"

**Mark:** They said I just need to be in contact with them... I acknowledge that the disconnect there was on me. But in my defense, any normal employee, they don't have to deal with this. So, it's like only employees who have disabilities have to deal with the system. It seems really unfair that HR should step up more and fill in the blanks there. It's great that you guys have a separate system so there's no contamination of information, but when that system is so disconnected that you just kind of toss people out the door and expect them to find their way back, it's kind of messed up.

**Tina:** Mark, the relationship we have with The Hartford is that they are a third-party independent vendor. For every accommodation or medical leave, it is expected that the employee will provide medical certification. Because this is medical certification, it goes to a third party so that they can do an independent, objective review and there is no compromise to your medical information. So, this is not in place in order to alienate individuals who may present with a disability. It is expected that the employee does fulfill their portion of this process, which is to contact The Hartford and provide the appropriate medical certification.

**Mark:** Right. And I just wanted to point out, the disconnect I'm pointing out here is... you just said it: you get them in contact with The Hartford. I would expect that I told the company that I have a disability and I need some accommodations, I would expect that you guys would help initiate that and get the claim number started, which was the disconnect before. I'm paired up against the system.

**Tina:** Mark, what would be the difference of me calling you into my office, giving you a phone number, giving you a phone, and leaving the office, versus giving you the phone number and saying "when you have an opportunity that is appropriate for you, please call them"? It's your medical information.

**Mark:** Because the second part is on my own free time.

**Tina:** No, it doesn't have to be on your own free time.
**Mark:** I'm just not provided time, I guess, to talk to them. If I try and make that call at work, I'd have to tell Aaron and explain it to him or risk being judged. I've been here for two years, you know I've had issues with Aaron. You guys have had ample opportunity to help me out.
**Tina:** Again, that's not our process.
**Dean:** I'm still a little confused. The Hartford ultimately is the third party that's going to manage this. Your feedback is that The Hartford process is confusing?
**Mark:** I still don't get how that works. I'm just basically asking for Aaron to not nitpick me. If this is purely performance reviews, then I may ask to be opted out of the yearly performance review so I'm not critiqued for stuff that has nothing to do with the pertinence of my job. I just want to show up every day, fix stuff, talk to people, be a part of the process.
**Dean:** Right, but specific to the accommodation... what is the accommodation that we're requesting? Is it related to break time?
**Mark:** Well, no. I had to say something, so I just said "extended break" because I was written up for breaks. I don't understand why I was written up for breaks because I don't abuse my breaks. I don't. I take medication out at my car almost every day. One or two of those instances of breaks was where I missed my first break, right? I didn't get a break in the morning, I had no lunch, and then close to the end of the day, I decided to take both my breaks together or just take a slightly... I even gave you guys time back! I took just a slightly longer break. The fact that you guys are critiquing me over that stuff, and I just want to show up and do a good job and not have to worry about that... I don't know how to make that into an accommodation, but that is the accommodation I need.
**Dean:** But if the breaks are running longer than their scheduled time...
**Mark:** Which they really are not. I mean, there's two or three instances over the course of an entire year.
**Tina:** In New Jersey or in Portland, an employee doesn't typically autonomously decide that because they missed a break, they will work with their supervisor to make arrangements.
**Mark:** Aaron doesn't facilitate that sort of conversation whatsoever.
**Tina:** So, for right now, we are going to temporarily approve a temporary accommodation where your breaks can be up to 22 minutes long. When the ADA process is complete, if it doesn't support this need, then that temporary accommodation will end.
**Mark:** And with regards to communication, if we have to have employment-related discussions, we'll make sure that Dean or Eric is here so we can work through those.
**Dean:** But the whole thing is following the process. It's not trying to be punitive; it's trying to be objective.
**Mark:** I understand you guys are just doing your job, but I would just ask you guys to take a step back and look at it from somebody else's perspective. Understand that this process can be flawed; it can be extraordinarily difficult for people. You're asking somebody who has limitations to do above and beyond what any other normal employee has to go through.
**Tina:** Mark, any individual who would like an accommodation needs to go through this process. I don't have any way of identifying who may or may not have a disability.
**Mark:** That's not my fault. That is your job, though. You cannot use your job to make my life more difficult because I have a disability.

**Tina:** No, because you have a disability, we have a process that allows for that. And you are refusing to follow the process. We provided contact people to you, you had questions, and you just said "this process is flawed." You should have reached back to Mary or Anisa.
**Mark:** And I failed to do that. Okay. But that's not my fault because, guess what? My disability is a disability of communication. Okay?
**Dean:** You're the one that stopped the communication. That's where I'm lost in this.
**Mark:** I would love to, you know, work you guys further into a corner, but I think we should be done here. You guys do have the responsibility to provide a safe workplace, and I feel you guys are failing to do that. Apparently, Aaron mentioned that I may have threatened him. Is that true? Did Aaron say that I threatened to sue him?
**Tina:** He said that you threatened to kill him, and you provided us the recording wherein you did indicate that you would potentially kill him.
**Mark:** I informed him that there are consequences to his actions. That is not a threat.
**Tina:** You don't get to determine how someone else perceives a threat.
**Mark:** I'm getting flustered. I'm shutting down. I can't even talk. I've provided additional evidence just now and you guys are refusing to follow up on it.
**Tina:** You don't call the police because somebody got written up? If you feel you need to call the police, Mark, go ahead.
**Mark:** I'd like a police report filed today about this.
**Tina:** We're not responsible for that, you are. If you think you need to call the police, call the police.
**Mark:** All this crap... and you guys are telling me, well, sucks to be you. I need 32 hours in a day that I need to just live and function and breathe and not kill myself, but that don't fucking add up. So, I'm pretty sure I'm just going to be quitting the job here. I have to look out for my own safety here.
**Tina:** Mark, we're asking you to please make contact with The Hartford.
**Mark:** I've been working here for two years. You know I've had issues with Aaron. You guys are making this impossible. I guess I'll just leave it at that.
**Dean/Tina:** You're done.

Transcript of October 6th 2025 meeting

**GILLITZER**: . . . pursued this, you know, with some passion, because it's like, I'd rather just slip by, make do. I'm working my ass off.
**KREILING**: Nobody says you're not.
**GILLITZER**: Right, I mean, but this is such a nitpicky thing.
**KREILING**: It is, but here's—
**GILLITZER**: I don't appreciate—
**KREILING**: —I kind of figured you'd say that—
**GILLITZER**: Oh no no. Because, see, I know what it is. You write me up, I lose my bonus, the company saves a couple grand.2 I really don't appreciate that. That is discrimination and wage theft. So like, two, you personally can be sued for speaking in these terms, all right? You can't put liability on the company or anybody else. Like, you know, if I have an issue with you discriminating against me, I get to personally sue you, so, I just hope you are fully under—aware of what you're doing.
**KREILING**: So at this point you're threatening to now sue me personally, though?
**GILLITZER**: If you take that as a threat, that's—
**KREILING**: Well it is—
**GILLITZER**: —that's a personal issue.
**KREILING**: —because you're telling me that you're going to sue me.
**GILLITZER**: No.
**KREILING**: That's what you just said.
**GILLITZER**: Yeah.
**KREILING**: So you're threatening to sue me.
**GILLITZER**: Sure. If that's how you want to take that. That's not a threat though.
**KREILING**: Well it is. When you're telling somebody you're going to sue them—
**GILLITZER**: It's also, you're also threatening to write me up.
**KREILING**: No, I'm actually writing you up. It's not a threat.
**GILLITZER**: So you want me to actually sue you?
**KREILING**: I have dates, and I have times, so—
**GILLITZER**: I take that as a threat. Maybe I should, maybe I should make a call here.
**KREILING**: Well, you can do it when you're off the clock.
**GILLITZER**: Because I feel very intimidated.
**KREILING**: You can do it off the clock. You can call anybody you want, but this conversation's over, and I'll bring this to HR—
**GILLITZER**: OK. Alright.
**KREILING**: —and that'll be it.
**GILLITZER**: Alright, that'll be it, huh? Well.
After a few seconds of muffled noises, the audio recording continues with a conversation between Gillitzer and Kerr:
**GILLITZER**: I'm having a real, real big issue. I'm feeling very intimidated by Aaron, and I feel like a police report needs to be made that I feel like he's harassing me and intimidating me. Once again, I've got a voice recording of all this, but I really do need something to be done

about this. I don't appreciate the way he's handling me and discriminating against me, isolating me.
**KERR**: So, a couple of things. You need to be more specific, and if you want an accommodation, you really need to go through the process.
**GILLITZER**: I've been trying, and like, I just, you make something so difficult for somebody that it's just not possible. It's like, I have a disability, I have issues. I need help and assistance, and when you make the process so hard that like I haven't been offered any assistance. You all just expect me to figure this process out and do it on my own and make it and then deal with all the repercussions of the way everyone treats me for all this. That's not fair, Julie.
**KERR**: Mark, you need to call The Hartford. Have you called The Hartford and started the process?
**GILLITZER**: And ask what? And say what?
**KERR**: Tell them that you want an accommodation and to start the process.
**GILLITZER**: For what? What is an accommodation? Like, what do I ask for? And what the hell is a third company going to do about my boss yelling at me and talking to me in the way he talks to me? How is The Hartford going to fix that? Because that's really my issue. I don't need all these weird accommodations. I just need for my boss not to act like he's out to get me and destroy my life. That's real simple, and The Hartford can't help me with that.
**KERR**: You have multiple, multiple times said you have a disability.
**GILLITZER**: Yeah.
**KERR**: And in order for us to deal with that, we need to start the accommodation process, and—
**GILLITZER**: I gotcha. I think I follow.
**KERR**: — your disability, I don't know what it is—.
**GILLITZER**: It's autism and Asperger's.
**KERR**: —is a communication style.
**GILLITZER**: Yeah.
**KERR**: And I don't know what the solution is, but we really need you to start that process.
**GILLITZER**: OK. I'll call them today after work. Absolutely. I think I follow. I don't, like, fully follow. I don't understand, but I will just do it in blind faith and hope that it all works out. But, like, I don't know what the hell I'm doing when I do this.
**KERR**: Right, it's the Americans with Disabilities Act.
**GILLITZER**: I don't, yeah—
**KERR**: And you say—
**GILLITZER**: I probably have to have something on file, yeah.
**KERR**: —you have a disability. There's a form you can fill out. It's going to ask you what you think needs to happen. I can see it more from a visible disability, like if somebody can't see or has struggles using—the accommodation is relatively easy because we can just get them a bigger screen.
**GILLITZER**: Right.
**KERR**: In your case, I don't know what the options are, so we will ask you what you think, or if you have a provider that's helped you—I'm sure you have a provider that at some point in time has helped you.

**GILLITZER**: Somewhat, but not really with the autism side of things. More with the anxiety, depression, social stuff like therapists and stuff, but not—
**KERR**: They can help. They can help. Or Mary can help.
**GILLITZER**: And I've asked my doctors about this sort of stuff but just never to this regard, you know. Yeah, I'll make the call, but—
**KERR**: There are things we can do. We just need to figure it out, OK? Did something happen today?
**GILLITZER**: No, yeah, Aaron tried writing me up, you know, over break times, and I mean, he says you know all about it, but whatever.
**KERR**: I saw a write up on break times.
**GILLITZER**: You can probably just read it and get the gist of it, but yeah, I mean—
**KERR**: Are you saying that those times are wrong?
**GILLITZER**: Two issues. A, you know, I use my breaks to, like, relax, to tent. You know, like, when I'm inside here I have to mask, you know, put on like, whatever, but like, a person can only do that for so long, and like, you know, when I'm by myself, that's when I can just breath and whatever. I use my break times to literally breathe. It's like, there's a perfect analogy. Masking or being autistic, it's like having to hold your breath in front of people, and then only when you're in complete isolation can you breathe again.
**KERR**: That would be an accommodation.
**GILLITZER**: That is, and like, you know, I was hoping to have a conversation with Mary or somebody I could just explain that to. This is great. Some system or some phone or something. I don't even know if I could work through that. It takes some understanding of like, you know me, and you see me, and you—I need ideas. I can't just come up with these ideas.
**KERR**: So, you do this. You start the ADA process. Call, and they'll ask you some questions. And then I will have Mary reach out to you. Because I think you'd be more comfortable with that, but she is way more experienced with making accommodations than I am because that's her specialty, benefits and leave.
**GILLITZER**: And that's cool.
**KERR**: I, you know, unless it's really obvious—
**GILLITZER**: Mhm. And no [inaudible] on anybody. This is just, yeah, this is just my struggle, and I appreciate you helping me out here. It doesn't seem like Aaron is trying to help me at all, but I mean, that's just a separate issue, but yeah, so.
**KERR**: Well, let's get this started. OK?
**GILLITZER**: Yeah. KERR: So are you done?
**GILLITZER**: Yeah, just about. 3:30. But, yeah, he pulled me out at 3 to do this, and yeah.
**KERR**: Well let's just regroup tomorrow, and I'll follow up with you.
**GILLITZER**: I'll do that as soon as I walk out the door here.
**KERR**: So you have The Hartford number?
**GILLITZER**: I do.